UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


**Tracy Agrusso**

   **v.**                                      Case No. 11-cv-519-PB
                                          Opinion No. 2013 DNH 006
**Michael J. Astrue, Commissioner**
**Social Security Administration**


MEMORANDUM AND ORDER


    Tracy Agrusso seeks judicial review of a ruling by the
Commissioner of the Social Security Administration denying her
application for disability insurance benefits.  Agrusso's
principal claim is that the Administrative Law Judge ("ALJ") who
denied her claim failed to properly evaluate the medical
evidence.  Agrusso urges this court to either reverse the
Commissioner's ruling or remand the case for further hearing.
For the reasons set forth below, I affirm the Commissioner's
ruling.

I.   BACKGROUND[1]

    Agrusso was born on September 22, 1971.  She has a high
school education and completed three years of college.  Her work

---

[1] The background facts are presented in detail in the parties'
Joint Statement of Material Facts (Doc. No. 15) and are
summarized here.  Citations to the Administrative Transcript are
indicated by "Tr."

experience includes jobs as a customer service representative, food service worker, sales associate, and secretary.

Agrusso filed for disability insurance and supplemental security income benefits on April 18, 2007.[2]  She alleged a disability onset date of October 1, 2003, in her original application, but later amended the date to January 1, 2007.  She claims disability due to migraine headaches, sleep apnea, residual effects of a knee injury, degenerative disc disease of the cervical spine, gastroesophageal reflux disease, affective disorder, post-traumatic stress disorder ("PTSD"), and borderline personality disorder.

On September 6, 2007, the Social Security Administration denied Agrusso's claim for disability insurance and supplemental security income benefits.  She requested a hearing, at which she appeared and testified on February 9, 2010.  Following the hearing, the ALJ issued a decision denying her request for benefits.  On June 30, 2010, the Decision Review Board remanded the case to the ALJ for a new hearing.  On May 16, 2011, Agrusso testified at a second hearing, and the ALJ again issued a

---

[2] The Joint Statement of Material Facts (Doc. No. 15) states that the application was filed on April 13, 2007, however, according to the record, it appears the application was actually completed on April 18, 2007.  Tr. 357.

decision denying her request for benefits.  The ALJ's decision became final on September 21, 2011, when the Appeals Council declined to review it.

## A.   **Medical History**

Agrusso received medical treatment from several different providers at Genesis Behavioral Health ("Genesis").  On January 11, 2007, Agrusso saw Pamela Ambrose, MSRC[3] at Genesis.  Ambrose filled out an intake form indicating that she is a twice divorced single mother of two behaviorally challenged boys, ages 14 and 17.  Agrusso claimed that she was experiencing stress because of her children, her unemployment, and her financial situation.  She reported feelings of detachment from her family, a past suicide attempt, and a history of abuse.  Agrusso stated that she was anxious and overwhelmed.  Ambrose recorded several observations about Agrusso's mental status.  She noted that Agrusso was cooperative and engaged, exhibited normal and goal oriented speech, possessed an above average amount of knowledge, was fully oriented, and that her affect was dysthymic.  She observed no evidence of psychosis, and Agrusso's insight and judgment were intact.  Ambrose diagnosed Agrusso with dysthymic

---

[3] A "MSRC" degree is a Master's of Science in Rehabilitation Counseling.

disorder[4] and gave her a Global Assessment of Functioning ("GAF")
score of 60.[5]

On February 8, 2007, Agrusso was examined by Judith
McCarthy, ARNP, at Genesis.[6]  McCarthy noted that Agrusso was
well-dressed and well-groomed.  Agrusso reported suicidal
thoughts with no intent or plan.  Agrusso also reported that she
was unable to work due to decreased concentration, but McCarthy
noted that Agrusso manages her household, takes care of her
children, and manages her money.  Agrusso also stated that she
has friends and participates in social activities, like going to
dance clubs, when she can afford it.  McCarthy diagnosed Agrusso

---

[4] Dysthymic disorder is "a chronic mood disorder manifested as
depression for most of the day, more days than not, accompanied
by some of the following symptoms: poor appetite or overeating,
insomnia or hypersomnia, low energy or fatigue, low self-esteem,
poor concentration, difficulty making decisions, and feelings of
hopelessness."  Stedman's Medical Dictionary 602 (28th ed. 2006)
[hereinafter Stedman's].

[5] The GAF scale is used to track "the clinical progress of
individuals in global terms, using a single measure.  The GAF
Scale is to be rated with respect only to psychological, social,
and occupational functioning."  Am. Psychiatric Ass'n,
Diagnostic and Statistical Manual of Mental Disorders 32 (rev.
4th ed. 2000) [hereinafter DSM-IV].  GAF scores range from 0-
100.  A score within the range of 51-60 indicates "[m]oderate
symptoms ... OR moderate difficulty in social, occupational, or
school functioning (e.g., few friends, conflicts with peers or
co-workers)."  Id. at 34.

[6] "ARNP" indicates that she is an Advanced Registered Nurse
Practitioner.

with a mood disorder and provisionally diagnosed her with
Attention Deficit Disorder ("ADD")/Attention Deficit Hyperactive
Disorder ("ADHD") and PTSD.  On March 8, 2007, McCarthy noted
that the ADHD screening tools Agrusso filled out supported the
diagnosis of ADHD and prescribed medication accordingly.

On July 11, 2007, Agrusso saw Dr. Michael Evans for a
consultative exam.  Agrusso told Dr. Evans that she had lost her
job, had trouble sleeping and concentrating, and felt she could
not function in a competitive work environment.  Dr. Evans
observed that Agrusso cried easily, was neatly dressed, had
slightly rapid speech, and no obvious pathology of thought.  Dr.
Evans's diagnosis included depression and personality disorder
with possible borderline hysteroid features.[7]  Dr. Evans's
assessment of Agrusso's current level of functioning included
the following observations: she is able to understand and
remember instructions; she is capable of interacting
appropriately and communicating effectively, although she
becomes tearful when talking about herself; she is having mild
difficulty sustaining attention and completing tasks, but this

---

[7] Hysteroid is defined as "[r]esembling or simulating hysteria."
Stedman's at 941.  Hysteria denotes "maladies involving physical
symptoms that seem better explained by psychological factors."
Id. at 940.

does not indicate ADD because it did not exist until recently when she was under more stress and more depressed.  Finally, Dr. Evans observed that "[t]he patient should be able to tolerate the stress of a work or work-related situations.  She appears capable of maintaining attendance and following instructions.  Because of her emotionality, she might have difficulty interacting appropriately with fellow employees or supervisors."  Tr. 706.

Ambrose saw Agrusso regularly in the summer and fall of 2007.[8]  During their meetings, they discussed issues Agrusso was having in her life and in her relationships and skills Agrusso could use to cope with those issues.  Ambrose made a variety of assessments and diagnoses during those meetings.  At her July 17, 2007 meeting with Ambrose, Ambrose diagnosed Agrusso with PTSD, borderline features with narcissistic traits, and ruled out ADD and dysthymia.  At their August 14, 2007 meeting, Ambrose diagnosed Agrusso with borderline personality disorder, ADD, and again ruled out dysthymic disorder.  At the September

---

[8] Specifically she was seen on: May 29, 2007; June 4, 2007; June 12, 2007; June 19, 2007; June 26, 2007; July 3, 2007; July 10, 2007; July 17, 2007; July 31, 2007; August 14, 2007; September 4, 2007; September 20, 2007; October 4, 2007; October 11, 2007; and September 3, 2008.

6

4, 2007, meeting, Ambrose diagnosed Agrusso with borderline personality disorder and ruled out PTSD and ADD.

Agrusso attended group therapy sessions starting on August 30, 2007.  On September 6, 2007, McCarthy noted that Agrusso was beginning to understand the skills discussed in group therapy and was able to interact with other group members in a supportive and validating manner.

On September 4, 2007, Dr. Michael Schneider, an agency medical consultant, reviewed Agrusso's records and concluded that she did not have a severe mental impairment.

Genesis closed Agrusso's case in December 2007, but in September 2008, Agrusso reapplied for services and resumed counseling.  On October 16, 2008, Agrusso had her first therapy session with Lois Hurley, MA, LCMHC.[9]  They met regularly and discussed some of the losses Agrusso had experienced in life and problems she was having with her relationships.[10]  Agrusso's mood

---

[9] "LCMHC" is a Licensed Clinical Mental Health Counselor.

[10] Agrusso and Hurley met on: October 16, 2008; October 29, 2008; November 20, 2008; December 8, 2008; January 9, 2009; February 4, 2009; March 3, 2009; March 12, 2009; March 26, 2009; July 16, 2009; December 2, 2009; and January 6, 2010.

during her meetings with Hurley varied from depressed to euthymic.[11]

On April 9, 2009, Agrusso met again with McCarthy.  Agrusso reported that she was not doing well, felt isolated and depressed, and had suicidal ideation without a plan or intent. McCarthy made several observations about Agrusso including that she was well dressed and groomed; was alert; had normal motor activity; her speech was mildly pressured; her affect was angry; she was sad and irritable; and that her thought form was logical and goal-directed.  McCarthy assessed Agrusso with PTSD, a mood disorder, and borderline personality disorder.

On January 20, 2010, Hurley completed a mental residual functional capacity ("RFC") questionnaire for Agrusso.  Hurley assigned Agrusso a current GAF score of 60 and described Agrusso's ability to function in areas needed to do unskilled work as seriously limited, unable to meet competitive standards, or as having no useful ability to function.  She ascribed marked and extreme limitations to Agrusso in areas needed to do skilled or semi-skilled work.

---

[11] Euthymia is defined as "[j]oyfulness; mental peace and tranquility" or "[m]oderation of mood, not manic or depressed." Stedman's at 678.

Dr. David Whitenack, M.D., managed Agrusso's medicine during this period.  His medication management note from January 12, 2010, indicates that Agrusso was suffering from severe anxiety and was withdrawn and somewhat agoraphobic.  Dr. Whitenack thought Agrusso's fundamental diagnosis was PTSD, but noted that Agrusso felt that it was borderline personality disorder.  He wrote, "I do not know the details of either really."  Tr. 779.  Dr. Whitenack's medication management note from February 2, 2010 states that increasing Agrusso's prescriptions for Ritalin and Klonopin improved her focus and sleep.

On August 12, 2010, Agrusso saw Dr. Vladimir Jelnov, M.D., at Genesis for a psychiatric evaluation.  Agrusso reported that she was forgetful and depressed, had racing thoughts, decreased concentration, and suicidal ideation without plan or intent. Dr. Jelnov noted that Agrusso was able to text message on her cell phone while answering his questions.  He found that she had no clear problems with attention or her ability to process and retain information.  He did not notice any signs of ADD.

On September 24, 2010, Dr. Jelnov completed a treating medical source statement.  He noted that Agrusso had moderate

limitations in activities of daily living and marked limitations in social functioning and concentration.  He noted that Agrusso had repeated episodes of decompensation of extended duration and would miss, on average, about two days of work per month.

Agrusso met with Dr. Jelnov again on September 28, 2010. Dr. Jelnov noted that Agrusso was able to express herself in a logical way and that her grooming and interpersonal skills were normal.  He assessed her GAF as 55.  Dr. Jelnov examined Agrusso on November 2, 2010, and reported his findings on November 8. He reported that she had moderate limitations in activities of daily living, social interaction, task performance, and stress reduction.

Agrusso saw Erin Crangle, M.Ed., on September 13, 2010. Agrusso reported her symptoms, including depression and anxiety, and noted that she had difficulty maintaining her home and finding employment.

On September 14, 2010, Samantha Carson, B.A., completed an "Adult Eligibility Form" for Agrusso and Dr. Denise Leville co-signed it.  The diagnoses included PTSD, a mood disorder, and borderline personality disorder.  Carson noted marked limitations in Agrusso's activities of daily living,

interpersonal functioning, adaptation to change, powers of concentration, and task performance.

Agrusso met with Carson, a case worker, and Crangle, a therapist, weekly between November 2010 and April 2011.[12] Crangle noted that Agrusso often cancelled her appointments, but called to reschedule them within a week.  During these sessions, Agrusso expressed frustration and anxiety about her pending disability claim.  She also discussed legal issues she was experiencing with her ex-husband and her relationship with her son.  Carson counseled Agrusso on techniques to reduce her depression.  In November, Agrusso was ordered to complete community service because of theft charges from three years prior.  Agrusso was having difficulty finding a place to perform the community service and completing the community service. Carson assisted her by calling a community service organization and modeling how to leave a voicemail message and role-playing with Agrusso before she placed a phone call.  Carson also helped Agrusso with grocery shopping.

---

[12] Specifically, she met with Crangle on November 2, 9, 18; December 6, 23; January 4, 13, 27; February 4; March 4, 11, 31; and April 7.  She met with Carson on November 2, 17, 23; December 2, 8, 14, 21; January 4, 14, 25; February 2, 16, 25; March 10, 16, 23, 30; and April 6.

Also during this time period, Agrusso was charged with shoplifting and was hospitalized after superficially cutting her wrist on February 17, 2011.  In her therapy sessions, she denied any intent to commit suicide, but continued to have suicidal thoughts.

Dr. Jelnov examined Agrusso during this period.  He noted that she was manipulative, but had normal interpersonal skills. On December 7, 2010, Dr. Jelnov co-signed a quarterly review that Crangle completed on December 6 in which Crangle assigned Agrusso a GAF of 45.[13]  Dr. Jelnov also co-signed a mental RFC questionnaire that Crangle completed on December 6 in which Crangle assigned Agrusso a current GAF of 55 and highest GAF in the past year at 55.  Tr. 801.  In the questionnaire, Crangle opined that Agrusso had marked limitations in her ability to interact appropriately with the public and would miss more than four days of work per month.

---

[13] A GAF score of 41–50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV at 34.

On March 10, 2011, Dr. Jelnov completed a mental RFC
assessment for Agrusso.[14]  Her GAF was 50.  He stated that her
grooming continued to decline, and she was lethargic and
depressed.  Her memory and concentration were fair to poor.  He
rated her ability to function in areas needed to do unskilled
work as seriously limited or unable to meet competitive
standards.  In some areas, he indicated that she had no useful
ability to function.  He opined that she would need to miss more
than four days of work per month.

## B.   Administrative Hearing - May 16, 2011

### 1.   Agrusso's Testimony

Agrusso testified at the hearing that she saw Dr. Jelnov
once a month and her case worker and therapist once a week.  She
testified that she was having a hard time managing suicidal
thoughts, and that her condition had worsened since January
2010.  She also discussed completing her community service
requirement in 2011.  She called local refugees to conduct a
survey for a Christian outreach program.

---

[14] This RFC questionnaire, like the one Crangle completed on
December 6, 2010, is written in Crangle's handwriting.

13

2.  <u>Dr. Koocher's Testimony</u>

Dr. Gerald Koocher testified by telephone as a medical
expert.  He holds Bachelor's and Master's degrees in psychology
and a Ph.D. in clinical and developmental psychology.  Dr.
Koocher testified that he had reviewed all the evidence in the
case and listened to Agrusso's testimony.  He said that the
evidence supported three diagnoses: depressive disorder,
PTSD/anxiety, and borderline personality disorder.  He said
Agrusso's condition had deteriorated since 2007, at which time
she had GAF scores of 60–70, to the present, where her GAF
scores are in the mid-fifties. Dr. Koocher acknowledged
Agrusso's legal troubles and her wrist-cutting.  He stated that
Agrusso clearly felt very troubled and had suffered very adverse
life circumstances.

Dr. Koocher testified that the evidence indicates that
Agrusso suffers a moderate level of limitation due to her mental
impairments.  He said that the narrative in treatment notes from
Genesis do not support a severe level of limitation.  The GAF
scores reflect a moderate level of impairment and are
inconsistent with the actual level of functional limitations
described by Dr. Jelnov and other providers.  He testified that

14

even when her symptoms were at their most severe, Agrusso was
capable of understanding and remembering short, simple
instructions and engaging in brief, superficial interactions
with the public.  He further testified that she would be able to
tolerate typical interactions with supervisors and coworkers
while completing routine tasks.  He testified that she was
capable of independent, goal-directed behavior while completing
routine tasks.

       3.  <u>Vocational Expert's Testimony</u>

     Vocational Expert ("VE") Louis Laplante testified that
Agrusso had previously worked as a food service worker, a
catalog sales order clerk, a sales associate, a secretary, and a
hotel clerk.  The ALJ asked Laplante to assume that an
individual who is 39 years old and has a similar vocational and
educational profile as Agrusso could occasionally lift or carry
fifty pounds, frequently lift or carry twenty-five pounds, stand
and walk with normal breaks for about six hours in an eight-hour
workday, and sit with normal breaks for a total of six hours in
an eight-hour workday.  This individual can also understand,
remember, and carry out short and simple instructions and
sustain attention and concentration over a typical workday and

workweek.  This individual is capable of brief, superficial interactions with the general public on an occasional basis and independent, goal-directed tasks.  The VE concluded that this person could perform work such as kitchen helper, addresser, marker, bakery worker, or a cleaner.

Raymond Kelly, Agrusso's attorney, then asked the VE a series of hypothetical questions.  He asked the VE to assume a 39-year-old individual with the same educational and vocational profile as Agrusso, with the capacity for light work, who is seriously limited in carrying out short and simple instructions. This hypothetical individual cannot maintain attention for two hour segments, cannot meet competitive standards, has problems with regular attendance and punctuality, and would miss more than four days of work per week.  This individual cannot sustain an ordinary routine without special supervision.  The VE testified that an individual with these restrictions would be unable to perform the jobs he previously mentioned.

Kelly also asked whether a person who has a marked problem with interpersonal relationships and difficulty with motivation would be able to perform the previously mentioned jobs.  The VE testified that such a person would not be able to perform the

jobs.

## C.   **The ALJ's Decision**

In her June 6, 2011 decision, the ALJ followed the five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520(a) and 416.920(a) to determine whether an individual is disabled.  Tr. 15-30.  At the first step, the ALJ found that Agrusso had not engaged in any substantial gainful activity since January 1, 2007, the amended alleged onset date.  Tr. 17. At step two, the ALJ found that Agrusso has the following severe impairments: "migraine headaches, sleep apnea, residuals status post knee injury, degenerative disc disease of the cervical spine, gastroesophageal reflux disease, affective disorder, post-traumatic stress disorder, and a borderline personality disorder."  Id.  At step three, the ALJ found that Agrusso did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Id. at 18.  The ALJ concluded that Agrusso retained the RFC to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c) except:

> [S]he is limited to understanding, remembering, and carrying out short and simple instructions.  She can sustain attention and concentration for these tasks and maintain that effort over a typical workday and workweek

17

within acceptable pace and persistent standards.  She is
capable of brief, superficial interactions with the general
public on an occasional basis.  She is able to participate
in typical social interactions with coworkers and
supervisors while completing these routine tasks.  The
claimant is able to tolerate stress of a routine work
setting, adapt to minor changes in routine, and is capable
of independent goal-directed behavior while completing
these tasks.  Id. at 20.

At step four, the ALJ concluded that Agrusso is unable to

perform any past relevant work.  Finally, at step five, the ALJ

noted that, considering her age, education, work experience, and

RFC, there are jobs that exist in significant numbers in the

national economy that Agrusso could perform.  Id. at 28.  As a

result, the ALJ concluded that Agrusso was not under a

disability, as defined by the Social Security Act at any point

from January 1, 2007 through the date of the decision.  Id. at

29.


## II. <u>STANDARD OF REVIEW</u>

Under 42 U.S.C. § 405(g), I am authorized to review the

pleadings submitted by the parties and the administrative record

and enter a judgment affirming, modifying, or reversing the

"final decision" of the Commissioner.  My review "is limited to

determining whether the ALJ used the proper legal standards and

found facts [based] upon the proper quantum of evidence." Ward
v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).

The findings of fact made by the ALJ are accorded deference
as long as they are supported by substantial evidence.  Id.
Substantial evidence to support factual findings exists "'if a
reasonable mind, reviewing the evidence in the record as a
whole, could accept it as adequate to support his conclusion.'"
Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765,
769 (1st Cir. 1991) (per curiam) (quoting Rodriquez v. Sec'y of
Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  If
the substantial evidence standard is met, factual findings are
conclusive even if the record "arguably could support a
different conclusion."  Id. at 770.  Findings are not
conclusive, however, if they are derived by "ignoring evidence,
misapplying the law, or judging matters entrusted to experts."
Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

The ALJ is responsible for determining issues of
credibility and for drawing inferences from evidence in the
record.  Irlanda Ortiz, 955 F.2d at 769.  It is the role of the
ALJ, not the court, to resolve conflicts in the evidence.  Id.

The ALJ follows a five-step sequential analysis for determining whether an applicant is disabled.  20 C.F.R. §§ 404.1520, 416.920.  The applicant bears the burden, through the first four steps, of proving that her impairments preclude her from working.  Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).  At the fifth step, the Commissioner must present "evidence of specific jobs in the national economy that the applicant can still perform."  Id.; Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

### III.  **ANALYSIS**

Agrusso challenges the ALJ'S decision to deny her disability claim by arguing that the ALJ erroneously gave greater weight to the opinion of Dr. Koocher, a testifying medical expert, than she gave to the opinions of Agrusso's treating source providers.  Agrusso also briefly argues that the ALJ erred at step three of the analysis by failing to consider the listed impairments in light of the most recent medical evidence.  The Commissioner moves to affirm the decision.

Because the ALJ's decision is supported by substantial evidence, I affirm the ALJ's decision.[15]

**A.   <u>Evaluating Medical Opinions</u>**

The court reviews an ALJ's factual findings under the deferential "substantial evidence" standard and must uphold the ALJ's determinations if substantial evidence in the record supports them.  Ward, 211 F.3d at 655.  When determining a claimant's eligibility for disability benefits, an ALJ must consider all medical opinions in the case record.  20 C.F.R. §§ 404.1527(b), 416.927(b).  The ALJ must articulate "good reasons" for the weight given to each treating source's opinion.  See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

The ALJ will give a treating source opinion controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the . . . record."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  In determining whether a treating source deserves controlling weight, the ALJ considers several factors,

---

[15] The ALJ's decision does contain errors.  For instance, the ALJ should not have cited Agrusso's trip to Lebanon, which occurred before the alleged onset date, as evidence of her ability to function.  Notwithstanding these errors, however, the ALJ's findings are still supported by substantial evidence.

including: the length of the treatment relationship and
frequency of examination; the nature and extent of the
relationship; the extent to which the evidence and the
physician's explanation of that evidence support the opinion;
the consistency of the opinion with the record as a whole;
whether the treating physician is a specialist; and any other
factors that tend to support or contradict the opinion.  20
C.F.R. §§ 404.1527(c)(3)-(6), 404.927(c)(3)-(6).  If a treating
source opinion is inconsistent with the record, the ALJ may give
it little weight.  The ALJ's order "must be sufficiently
specific to make clear to any subsequent reviewers the weight
the adjudicator gave to the treating source's medical opinion
and reasons for that weight."  Young v. Astrue, Civil No. 10-CV-
417-JL, 2011 WL 4340896, at *9 (D.N.H. Sept. 15, 2011) (quoting
SSR 96-2P, 1996 WL 374188 (July 2, 1996)).

     Evidence from "[a]cceptable medical sources" is required to
establish whether the claimant has a medically determinable
impairment, but evidence from "[o]ther sources" may be used to
show the severity of the claimant's impairments and how it
affects her ability to work.  20 C.F.R. § 416.913(a), (d).
Although the ALJ does not treat evidence from other sources with

the same deference a treating physician's opinion merits,
evidence from other sources may be entitled to some weight,
especially when that source has a treatment relationship with
the plaintiff.  20 C.F.R. §§ 416.913(a, d), 416.927(d); see
Dumensil v. Astrue, 10-CV-060-SM, 2010 WL 3070107, at *6 (D.N.H.
Aug. 4, 2010).

B.    **The ALJ's Treatment of Evidence**

Agrusso argues that the ALJ should have given more weight
to the opinions of her treating sources from Genesis.  The ALJ,
however, provided good reasons for why she discounted the
opinions of Agrusso's treating source providers from Genesis.
Accordingly, I affirm the ALJ's decision.

First, the GAF scores assigned by Agrusso's treatment
providers at Genesis are inconsistent with each other and with
treatment notes.  For instance, on December 6, 2010, Crangle
filled out two different forms, assigning Agrusso a GAF score of
45 on one form and 55 on the other.  Dr. Koocher testified that
the treatment notes and opinion statements of several of the
providers at Genesis are inconsistent, particularly concerning
the GAF ratings.  For instance, Dr. Koocher testified that
Hurley gave a GAF in the mild range of impairment, but checks

23

off some marked impairments.  Dr. Koocher testified that "they
just don't fit together."  Tr. 105.  Similarly, the December 6,
2010, mental RFC completed by Crangle and signed by Dr. Jelnov
indicated a GAF of 55, in the moderate range of impairment, but
the narrative did not support the level of severity indicated on
the forms.  Tr. 105-06.  The ALJ appropriately afforded little
weight to the various GAF scores assigned to Agrusso because
they were inconsistent with the treatment notes.  Tr. 22.

Second, the ALJ explained why she gave little weight to Dr.
Jelnov's opinion despite his status as treating physician.  The
ALJ detailed several instances in which Dr. Jelnov's GAF ratings
and mental status examinations were inconsistent and cast doubt
upon the credibility of his opinions.  Tr. 25-26.  Further, the
ALJ explained, Dr. Jelnov's treatment notes described a level of
functioning that is inconsistent with his assessment that
Agrusso is unable to perform unskilled work.  Tr. 26.  In August
2010, Dr. Jelnov stated that Agrusso had no clear problems with
attention or her ability to process and retain information.  Tr.
784.  In a November 2010 psychiatric evaluation, Dr. Jelnov
concluded that Agrusso was moderately limited in her ability to
function in daily activities, interact socially, perform tasks,

24

and react to stress on a scale from no limitation to extreme limitation.  Tr. 837-38.  He estimated that Agrusso would be able to return to work in one to two years.  Tr. 838.  The ALJ also found that Agrusso's presentation and testimony at the hearing was inconsistent with Dr. Jelnov's assessment of Agrusso's inability to function.

The ALJ instead credited the opinion of Dr. Koocher, who reviewed the record and testified at the hearing that Agrusso retains the RFC to work with some limitations.  Dr. Koocher acknowledged Agrusso's symptoms, but stated that the evidence did not support more than a moderate level of limitation due to her mental impairments.  The ALJ was entitled to rely on Dr. Koocher's assessment of the evidence.  See Lizotte v. Sec'y of Health and Human Servs., 654 F.2d 127, 130 (1st Cir. 1981).

For all of these reasons, I conclude that the ALJ's decision is supported by substantial evidence.

## C.   **ALJ's Step Three Analysis**

Agrusso briefly asserted that the ALJ erred at step three of the sequential analysis by failing to consider the listed impairments in light of the most recent medical evidence.[16]

---

[16]  Agrusso raised this argument in three sentences: "The ALJ's

After determining at step two that Agrusso has several severe impairments, the ALJ determined at step three that none of her impairments met or medically equaled any of the impairments listed in 20 C.F.R. 404, Subpart P, Appendix 1.  In the step three analysis section, the ALJ cites several records from 2007 and 2010.

Agrusso argued that the ALJ erred in relying principally on records from 2007 in this section of her decision and failing to explain why the listing requirements were not met at a later date.  Agrusso, however, failed to explain how evidence from later in the record meets or medically exceeds a specific listing.  Furthermore, the ALJ cited record evidence from as recently as November 2, 2010 to support her finding that Agrusso did not meet or medically exceed any of the listed impairments.  Tr. 19, 781.  The rest of the ALJ's decision demonstrates that she did consider all the record evidence and did not limit her inquiry to 2007 evidence.  See Rice v. Barnhart, 384 F.3d 363, 370 n.5 (7th Cir. 2004) ("Because it is proper to read the ALJ's

---

analysis of whether the plaintiff met or equaled any of the Listed Impairments (Tr. 19) primarily focused on evidence from 2007 and did not consider the Listings in light of more recent medical evidence.  She should have explained why the Listing requirements were not met at a later date.  The plaintiff's condition had clearly deteriorated by 2010."

decision as a whole, and because it would be a needless formality to have the ALJ repeat substantially similar factual analyses at both steps three and five . . . we consider the ALJ's treatment of the record evidence in support of both his conclusions at steps three and five.").  Accordingly, I am unpersuaded that the ALJ based his step three determination on outdated medical evidence.

### IV.   **CONCLUSION**

For the foregoing reasons, I deny Agrusso's motion for an order reversing or remanding the decision of the ALJ (Doc. No. 11) and grant the Commissioner's motion to affirm the decision (Doc. No. 14).

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

January 15, 2013

cc:  T. David Plourde
     Raymond J. Kelly